Daniel J. Pochoda (SBA 021979)
Kelly J. Flood (SBA 019772)
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
dpochoda@acluaz.org
kflood@acluaz.org

Alexa Kolbi-Molinas (*Pro hac vice* application pending)
S. Talcott Camp (*Pro hac vice* application pending)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
Akolbi-molinas@aclu.org
tcamp@aclu.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MARICOPA COUNTY BRANCH, NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM, <br><br> Plaintiffs, <br><br> v. <br><br> TOM HORNE, ATTORNEY GENERAL OF ARIZONA, IN HIS OFFICIAL CAPACITY; ARIZONA MEDICAL BOARD; AND LISA WYNN, EXECUTIVE DIRECTOR OF THE ARIZONA MEDICAL BOARD, IN HER OFFICIAL CAPACITY, <br><br> Defendants. | NO. <br><br> **COMPLAINT** |

Plaintiffs National Association for the Advancement of Colored People, Maricopa

County Branch, and National Asian Pacific American Women's Forum for their

complaint in the above-captioned matter allege as follows:

**PRELIMINARY STATEMENT**

This is an action seeking a declaration that H.B. 2443 ("the Act") violates the Fourteenth Amendment to the United States Constitution.  This action also seeks a permanent injunction enjoining the Defendants from enforcing or administering the Act.  The Act is codified as Ariz. Rev. Stat. Ann. §§ 13-3603.02, 36-2157.

The Act is an attack on the dignity of the Black women and Asian or Pacific Islander ("API") women of Arizona.  Based on nothing more than invidious racial stereotypes about the reasons minority women seek abortion care, the Act intentionally singles out Black and API women and stigmatizes their abortion decisions.  The Act is premised on the sponsors' beliefs that Black and API women are deliberately using abortion to destroy their own communities. This unprecedented move to disparage and control the personal, private decisions of Black and API women, in particular, is a blatant violation of Equal Protection and the prohibition against state laws that discriminate on the basis of race.

**PARTIES**

**Plaintiffs**

1.      Plaintiff Maricopa County Branch, National Association for the Advancement of Colored People, (MC-NAACP) founded in 1919, has hundreds of members, including Black women of child-bearing age.  Founded in 1909, the national NAACP is the nation's oldest and largest civil rights organization and currently has more than 500,000 members nationwide and around the world.  MC-NAACP is one of 2,200 local NAACP chapters around the country.  MC-NAACP's members include women who have sought and women who will seek abortion care, as well as women who have considered or would consider doing so if faced with an unintended or medically complicated pregnancy.

2.      MC-NAACP's principal objectives are to ensure the political, educational, social and economic equality of minority group citizens of Arizona; to eliminate racism; to publicize the adverse effects of discrimination; and to initiate lawful action to secure

the elimination of racial and ethnic bias.  MC-NAACP is particularly concerned about discrimination against Black women, who bear the brunt of two or more categories of protected status.  MC-NAACP strongly supports the right of all Black women facing an unintended pregnancy to make the best decision for their circumstances—whether that decision is to continue the pregnancy and parent, place the child for adoption, or terminate the pregnancy—and trusts Black women to make important moral decisions for themselves, their families, and their communities.  MC-NAACP vigorously objects to the invidious and unfounded racial stereotype, which underlies the Act, that a Black woman who chooses abortion does so out of racial animus towards her own community.  In addition, the MC-NAACP vigorously objects to the invidious and unfounded assumption, also underlying the Act, that Black women who make the personal and private decision to end a pregnancy do not do so knowingly or thoughtfully.

3.     MC-NAACP joins this lawsuit on behalf of its members because the Act is motivated by, based on, and perpetuates racially discriminatory stereotypes about Black women and abortion care, and thereby demeans, stigmatizes, and discriminates against its members.

4.     Plaintiff National Asian Pacific American Women's Forum ("NAPAWF"), founded in 1996, is the largest national, multi-issue API women's membership organization with more than 2,000 dues-paying members and more than 6,000 activists nationwide, including API women in Arizona of child-bearing age.  NAPAWF'S Arizona members include API women who have sought and will seek abortion care, as well as API women who have considered or would consider doing so if faced with an unintended or medically complicated pregnancy.

5.     NAPAWF's mission is to build a movement to advance social justice and human rights for API women and girls.  As part of its work, NAPAWF advocates, *inter alia*, on a broad range of sexual and reproductive justice issues that affect the lives of API women and girls—including son-preference and bans on sex-selection abortion—and works to educate its members, policymakers and the public on these issues.  To address

gender bias within the API community and beyond, NAPAWF works with other Asian American women's organizations in effective and culturally-competent ways to create programs that build women's economic power and leadership skills, enable women to empower themselves, and decrease gender stereotyping.  NAPAWF opposes bans on sex-selection abortion because such bans discriminate against the API community; increase, rather than decrease, gender bias by interfering with a woman's personal and private medical decisions and by denigrating API women's capacity to make these decisions; and fail to address the underlying issue of son-preference.  On behalf of its members, NAPAWF has testified numerous times against similar anti-Asian, sex-selection abortion bans in the United States Congress.

6.      NAPAWF joins this lawsuit on behalf of its members because the Act is motivated by, based on, and perpetuates racially discriminatory stereotypes about Asian culture, API women, and abortion care, and thereby demeans, stigmatizes, and discriminates against its members.

**Defendants**

7.      Defendant Tom Horne is the Attorney General of Arizona.  Under the Act, the Attorney General may bring an action to enjoin any violations of Ariz. Rev. Stat. Ann. 13-3603.02(a).  *See* Ariz. Rev. Stat. Ann. § 13-3603.02(b).  Additionally, the Attorney General provides the Arizona Medical Board with legal counsel, including providing assistance to the Board to interpret its obligations and enforcement responsibilities under new legislation.  *See* Ariz. Rev. Stat. Ann.  § 41-192.  The Attorney General also represents the Board as its legal counsel and defends its decisions to revoke or suspend physicians' licenses in appeals before the state courts.  *Id.*; *see also id.* § 41-193.  Mr. Horne is sued in his official capacity.

8.      Defendant Arizona Medical Board is the entity responsible for enforcing disciplinary sanctions against physicians who violate the challenged provisions, including Ariz. Rev. Stat. Ann. § 36-2157 (the affidavit requirement).  *See* Ariz. Rev. Stat. Ann. § 32-1403.

9.     Defendant Lisa Wynn is the Executive Director of the Arizona Medical Board.  The Board may delegate much of its disciplinary authority to the Executive Director.  *See* Ariz. Rev. Stat. Ann. § 32-1405.  Ms. Wynn is sued in her official capacity.

## JURISDICTION

10.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and the Fourteenth Amendment to the United States Constitution.

11.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.     Venue in this court is proper under 28 U.S.C. § 1391(b)(1).

## THE ACT

### Statutory Provisions

13.     The Act was passed by the Arizona Legislature on March 23, 2011, and signed into law by Governor Brewer on March 29, 2011.  The Act became effective on July 20, 2011.  H.B. 2443 (2011) (attached hereto as Exhibit A) ("Ex. A").

14.     The Act amended Ariz. Rev. Stat. Ann. § 13-3603 to prohibit any person from knowingly providing an abortion to any woman seeking the procedure because she does not want to give birth to a child of a certain race or gender.  *See* 13-3603.02(A)(2).

15.     The Act prohibits any person from knowingly using force or the threat of force to injure or intimidate a woman for the purpose of coercing a sex-selection or race-selection abortion.  *See* Ariz. Rev. Stat. Ann. § 13-3603.02(A)(2).  Under pre-existing Arizona law it was already unlawful to coerce a woman to have an abortion for *any* reason.  *See* Ariz. Rev. Stat. Ann. § 36-2153(A)(2)(d).

16.     The Act also prohibits any person from knowingly soliciting or accepting monies to finance a sex-selection or race-selection abortion.  *See* Ariz. Rev. Stat. Ann. § 13-3603.02(A)(3).

17.     Under the Act, anyone who knowingly performs, coerces, or solicits or accepts money for a race- or sex-selection abortion is guilty of a Class 3 felony.  *See* Ariz. Rev. Stat. Ann. § 13-3603.02(A).

18.     Under the Act, any physician, physician's assistant, nurse, counselor or other medical or mental health professional who knowingly fails to report known violations of this section is subject to a civil fine of not more than ten thousand dollars.  *Id.* at (D).

19.     Under the Act, the Attorney General or the County Attorney may bring an action in Superior Court to enjoin the activity prohibited by the Act.  *Id.* at § 13-3603.02(B).

20.     The Act also creates a civil penalty provision that allows certain individuals to recover against a physician who has allegedly performed a race- or sex-selection abortion.  *Id.* at § 13-3603.02(C).

21.     For example, the Act allows a woman's husband at the time she has a sex-selection or race-selection abortion, or if the woman has not attained eighteen years of age at the time of the abortion, her parents, to bring a civil action to obtain relief, including monetary damages for all alleged injuries, whether psychological, physical or financial, including a loss of companionship and support, resulting from the abortion.  *Id.* at § 13-36-3.02 (C).

22.     The woman's husband (or her father, if she is a minor) may avail himself of the civil penalties provision even if the pregnancy is a result of his criminal conduct, i.e. rape or incest.

23.     There is no provision in the Act that allows a woman who is allegedly manipulated or coerced into having a race- or sex-selection abortion against her will to recover civil damages under the Act.

24.     The Act also amended Ariz. Rev. Stat. § 36-2157 to require any person who knowingly performs or induces an abortion to complete an affidavit, before the abortion, stating (1) that the person making the affidavit is not providing the abortion care because

of the "child's" sex or race and (2) has no knowledge that the woman has decided to seek abortion care because of the "child's" sex or race.

**Legislative History and Intent**

25.     The stated purpose of the Act, which is entitled the "Susan B. Anthony and Frederick Douglass Prenatal Nondiscrimination Act of 2011," is to "protect unborn children from prenatal discrimination in the form of being subjected to abortion based on the child's sex or race." Ex. A.  To achieve its stated purpose, the Act requires any doctor who performs an abortion to complete an affidavit that states, *inter alia*, that the woman seeking abortion care does not do so out of racial or gender animus towards her own fetus. *See* Ariz. Rev. Stat. Ann. § 36-2157.  This affidavit becomes a permanent feature of the woman's medical files.

26.     According to the legislative history, the Act was justified on two grounds: (1) that the high rate of abortion in the Black community proves that Black women are terminating their pregnancies in order to "de-select" members of their own race and (2) that the future immigration of API women to Arizona will make sex-selection abortion an issue within the state.

27.     The sponsors and supporters of the Act did not identify any example of a race- or sex-selection abortion that took place in Arizona.

28.     Because the Act is based entirely on racially-motivated stereotypes and generalizations about Black and API women's reasons for deciding to terminate a pregnancy, the Act violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

*Ban on Race-Selection Abortion*

29.     The statements of the primary sponsor of HB 2443 and other legislators who supported this bill focused exclusively on the reported rates of abortion among Black women.

30.     During the debate in the House Health and Human Services Committee, Rep. Montenegro, the Act's primary sponsor, was quoted as stating the Act was

7

necessary "because minority babies are several times more likely to be aborted than white babies." According to Rep. Montenegro, this was evidence that so-called race-selection abortions were occurring in Arizona. *See e.g.*, Tessa Muggeridge, "House panel advances bill to ban abortions based on gender or race," Cronkite News (Feb 9, 2011), available at http://cronkitenewsonline.com/2011/02/house-panel-advances-bill-to-ban-abortions-based-on-gender-or-race/. Montenegro also "insisted that some abortions are performed because a mother does not want a . . . minority baby." Caitlin Coakley Beckner, "House OKs outlawing of race- and gender- selection abortion," Arizona Capitol Times (Feb 21, 2011, 4:55 p.m.), available at http://azcapitoltimes.com/news/2011/02/21/bill-to-ban-selection-abortion-gets-initial-oks/#ixzz2KLO6v3Tl.

31.    Similarly, another Senator read a letter into the legislative record from U. S. Congressman Trent Franks that stated a ban on race-selection abortions was necessary because "African-American babies are now aborted at five times the rate of White babies to the point that nearly 50 percent of Black babies are aborted. This is perfectly legal in America . . . We criticize other nations for human right [*sic*] abuses; at the same time, we look the other way while our own children are being killed simply because [they are] the wrong . . . race." Act: Senate Floor Session, 2011 Leg., 50th Sess., 1st Reg. Sess., 8 (March 21, 2011) (attached hereto as Exhibit B) ("Ex. B").

32.    The rate of abortion among Black women was offered by many legislators as evidence of so-called race-selection abortions. *See e.g.*, Act: Hearing on H.B. 2443 Before the H. Comm. On Health and Human Services 2011 Leg., 50th Sess., 1st Reg. Sess. (February 9, 2011) at 63-66, 74-75 (offering rate of abortion among Black women in Arizona and nationwide as evidence of race-selection abortion and justification for bill) (attached hereto as Exhibit C) ("Ex. C"). However, at no time during the legislative debate was any testimony or evidence introduced attempting to link the rate or number of abortions among white women, or women of any race except Black women, to so-called race-selection abortions.

33.     The Act's sponsors and supporters did not consider any reasons for the higher abortion rate among Black women, other than a desire to reduce the number of Black people in our society.

34.     The legislative record also reveals that an important motivation for the supporters of this bill was their belief in the existence of an alleged plot by some abortion providers to eliminate the Black race, along with their belief that Black women were too foolish to resist such a plot. *See e.g.*, Ex. C at 63-65, 84-85; Act: Hearing on H.B. 2443 Before the H. Comm. of the Whole, 2011 Leg., 50th Sess., 1st Reg. Sess., 10-11 (February 21, 2011) (attached hereto as Exhibit D) ("Ex. D").

35.     The Act's sponsors and supporters put forward no other reasons for the rate of abortion among Black women.

36.     The Act's sponsors and supporters in the legislature took the position that the race-selection ban was necessary to protect Black women from their weak-mindedness in failing to resist those seeking to reduce or eliminate the Black race. No testimony was introduced as to why Black women, unlike women of other races, were manipulated into obtaining abortion care they did not want.

37.     The public and record statements and positions of the sponsors of the Act and its supporters demonstrate that they were motivated to pass this Act based on their beliefs that a ban on race-selection abortion is necessary to stop Black women from having abortions and thereby to reduce the rate of abortion among Black women.

38.     No evidence was introduced in the legislature in support of this Act that identified any woman in Arizona who had an abortion with the intent to reduce the number of Blacks in Arizona or in the population generally.

39.     This Act, which purports to protect the embryos and fetuses of "minority" women from being "targeted for abortion," necessarily considers the race of the pregnant woman who decides to obtain abortion care (or her partner).

40.     It is undisputed that a Black baby requires a Black parent.

*Ban on Sex-Selection Abortion*

41.    The Act also imposes requirements and sanctions on sex-selection abortions.  The legislative concerns about these alleged acts were derived solely from the Act's sponsors' and supporters' beliefs about API women. No evidence was presented about women from any other race allegedly engaging in this practice.

42.    The sponsors and supporters of this Act repeatedly presented reports of sex-selection abortions in India and China.  *See e.g.*, Ex. C at 62-63, 86-89; Ex. D at 44; Act: Hearing on H.B. 2443 Before the S. Comm. on Healthcare and Medical Liability Reform, 2011 Leg., 50th Sess., 1st Reg. Sess., 72, 90 (March 2, 2011) (attached hereto as Exhibit E) ("Ex. E").

43.    The sponsors and supporters of this Act repeatedly invoked the present and future immigration of API women to Arizona as justification for the Act.

44.    The ban in the Act on sex-selection abortions was based on the sponsor's and supporters' race-based beliefs and stereotypes about API women and the reasons they decide to seek abortion care.

45.    For example, Senator Murphy, Vice-Chair of the Senate Committee on Healthcare and Medical Liability Reform, stated when explaining his vote:

> We know that it's something that is pervasive in some areas.  We know that people from those countries and from those cultures are moving and immigrating in some reasonable numbers to the United States and to Arizona.  And so with that in mind, why in good conscience would we want to wait until the problem does develop and bad things are happening and then react when we can be proactive and try to prevent the problem from happening in the first place.

Ex. E at 92-93.

46.    Similarly, State Senator Nancy Barto, another of the bill's sponsors, explained the need for a ban on sex-selection abortion as follows: "We have to admit what is happening.  The trend lines are there.  With a multicultural society as America is becoming more of, we have to guard against that." *See e.g.* Ex. E at 95; *see also* Ex. C at 88 (Statement of Sydney Hay, Defending America's Future) ("[S]ome Americans are exercising sex selection practices within the United States consistent with discriminatory

practices common to their country of origin or the country to which they trace their ancestry").  Likewise, upon passage of the bill, Sen. Barto stated, "We are a multicultural society now and cultures are bringing their traditions to America that really defy the values of America, including cultures that value males over females." Associated Press (Mar. 31, 2011), "Arizona law bans abortion based on race or gender," http://www.foxnews.com/politics/2011/03/31/arizona-law-bans-abortions-based-race-gender/#ixzz2KLUU1VXI.

47.    The language used by the Act's sponsors and supporters, suggesting that API women as a group possess shared racial characteristics that make them a threat to American values and society, mirrors the racist and xenophobic language that drove Anti-Asian measures in the late 19th and early 20th century in this country.  *See Hirabayashi v. United States*, 828 F.2d 591, 596 (9th Cir. 1987) ("The Justice Department . . . argued that because of cultural characteristics of the Japanese Americans, including religion and education, it was likely that some, though not all, American citizens of Japanese ancestry were disloyal"); *Oyama v. California*, 332 U.S. 633, 668-69 (1948) ("[Japanese] are said to constitute a menace, a 'yellow peril,' to the welfare of California.  They are said to be encroaching on the agricultural interests of American citizens.  They are said to threaten to take over all the rich farm land of California.  They are said to be so efficient that Americans cannot compete with them.") (Murphy, J., concurring) (describing legislative history of Alien Land Law); *Korematsu v. United States*, 323 U.S. 214, 237-38 (1944) ("Individuals of Japanese ancestry are condemned because they are said to be a 'large, unassimilated, tightly knit racial group, bound to an enemy nation by strong ties of race, culture, custom and religion.'") (internal citations omitted) (Murphy, J., dissenting).

48.    No evidence was presented to the legislature in support of this Act of any woman of any race, including an API woman, having a sex-selection abortion in Arizona in order to prevent the birth of a female (or male) baby.

49.    No evidence was presented to the legislature in support of this Act about any woman, including an API woman, who had allegedly engaged in or supported sex-

selection abortions in another country and were now living in or planning to reside in Arizona.

50.     The State of Arizona's own statistics, which were available to the legislators at the time they considered the Act, showed no discrepancy between the gender ratios of births to API women and of births to other women in Arizona: Over the ten-year period from 1999-2009, the percentage of female births in Arizona has remained constant, and fluctuated within a small range, for all groups; for the total population, the percentage of births that were female babies ranged from 48-50%; among White non-Hispanic women it was 48-49%; among Hispanic or Latina women it was 49%; among Black or African-American women it was 46-51%; among American Indian or Alaska Native women it was 49-51%; and among API women it was 47-50% (48% in 2009). Arizona Department of Health Services, Arizona Health Status and Vital Statistics 2009 report, Induced Terminations of Pregnancy, Table 1B-5, 1B-6, 1B-8, 1B-10, 1B-12, 1B-14, http://www.azdhs.gov/plan/report/ahs/ahs2009/t1b.htm.

51.     These statistics also showed that the vast majority (approximately 85%) of abortions among women of all races in Arizona take place before the sex of the embryo or fetus can be determined (11 weeks or less).  *Id.* at Table 1D-4, *available at* http://www.azdhs.gov/plan/report/ahs/ahs2009/pdf/1d4.pdf.  Among API women the number is even higher: 91% of API women obtaining abortion care in Arizona do so before it is possible to learn the gender of the embryo or fetus.  *Id.*

**Impact of the Act**

52.     The Act intentionally stigmatizes certain women seeking abortion care on the basis of race.

53.     The Act is motivated by racist and discriminatory beliefs about the reasons Black and API women decide to obtain abortion care.

54.     The Act intentionally denies Black and API women equal treatment under the law because its purpose is – by virtue of their race – to scrutinize their personal, private, and constitutionally protected decisions to have an abortion.

12

55.     The Act demeans, stigmatizes, and discriminates against Black women who decide to end a pregnancy.  The legislative history of the Act demonstrates that it is based on the false premise that, unlike a woman of another race, a Black woman making a personal, private, and constitutionally protected medical decision about whether and when to have a child is motivated by racial animus towards her embryo or fetus, towards Black children, and/or towards the Black community as a whole.

56.     As the resulting product of racially based decisions by and attitudes of the sponsors and supporters, the Act demeans, stigmatizes, and discriminates against Black women by suggesting that, unlike women of any other race, they are too ignorant or incompetent to make the personal, private, and constitutionally protected medical decision about whether and when to have a child.

57.     The Act demeans, stigmatizes, and discriminates against API women who decide to end a pregnancy.  The legislative history demonstrates that the Act is motivated by the view of the sponsors and supporters that, because of her racial and ethnic background, an API woman's personal, private, and constitutionally protected medical decision about whether and when to have a child is automatically suspect.  Moreover, the legislative history demonstrates that the purpose of and justification for the Act is to monitor an API woman's personal, private, and constitutionally protected medical decision about whether and when to have a child in order to protect the API community—API girls, in particular—*from* API women.

## CAUSE FOR RELIEF: EQUAL PROTECTION
### (Fourteenth Amendment)

58.     As Black and API women, Plaintiffs' members are members of a protected class.

59.     The Act violates Plaintiffs' members' rights under the Equal Protection Clause of the Fourteenth Amendment because it stigmatizes their decision – and no other women's decision – to seek abortion care.

60.     The Act violates Plaintiffs' members' rights under the Equal Protection Clause of the Fourteenth Amendment because its purpose is to reduce the rate or number of Black and API women who have abortions, but not women of any other race.

61.     The Act violates Plaintiffs' members' rights under the Equal Protection Clause of the Fourteenth Amendment because it is based on racist and discriminatory stereotypes about Black and API women.

62.     The Act violates Plaintiffs' members' rights under the Equal Protection Clause of the Fourteenth Amendment because its purpose is to scrutinize Black and API women when they make the personal, private, and constitutionally protected decision to end a pregnancy.

63.     The Act violates Plaintiffs' members' rights under the Equal Protection Clause of the Fourteenth Amendment because it demeans, humiliates, and discriminates against those Black and API women who choose abortion care by treating their personal, private, and constitutionally protected decision to end a pregnancy as automatically suspect solely because of their race.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A.     To enter a judgment declaring that H.B. 2443, codified at Ariz. Rev. Stat. Ann. §§ 13-3603.02, 36-2157, violates the United States Constitution.

B.     To issue a permanent injunction restraining Defendants, their employees, agents, and successors in office from enforcing HB 2443.

C.     To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D.     To grant such other and further relief as the Court deems just and proper.

1

Dated this this 29th day of  May, 2013.

2

3

4

ACLU FOUNDATION OF ARIZONA

5

6

By      /s/ Daniel J. Pochoda

Daniel J. Pochoda

7

Kelly J. Flood

3707 North 7th Street

8

Phoenix, AZ 85014

9

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

10

11

Alexa Kolbi-Molinas*

S. Talcott Camp*

12

125 Broad Street, 18th Floor

New York, NY 10004

13

*Pro hac vice application pending

14

Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28