**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National Association for the Advancement of Colored People, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Thomas Horne, in his official capacity as Attorney General of the State of Arizona, et al.,<br><br>Defendants. | No. CV13-01079-PHX-DGC<br><br>ORDER |

Plaintiffs sue the Arizona Attorney General, the Arizona Medical Board, and the Executive Director of the Board, challenging the constitutionality of a statute that prohibits race-based and gender-based abortions and seeking an injunction to prevent its enforcement. Doc. 1. Defendants have filed a motion to dismiss which is fully briefed. Docs. 25, 39, 42. No party has requested oral argument. For the reasons set forth below, the Court will grant the motion and dismiss this case for lack of standing.

**I.  Background.**

In 2011, the Arizona Legislature enacted House Bill 2443 ("the Act"), titled the "Susan B. Anthony and Frederick Douglass Prenatal Nondiscrimination Act of 2011." 2011 Arizona Session Laws, Chapter 9. Governor Janice Brewer signed the Act into law on March 29, 2011. Doc. 1, ¶ 13; Doc. 1-1 at 2-4. The Act amends some sections of the Arizona Revised Statutes by adding A.R.S. §§ 13-3603.02 and 36-2156. Doc. 1, ¶ 14; Doc. 1-1 at 2-4. The new § 13-3603.02 provides:

A. A person who knowingly does any of the following is guilty of a class 3 felony:

1. Performs an abortion knowing that the abortion is sought based on the sex or race of the child or the race of a parent of that child.

2. Uses force or the threat of force to intentionally injure or intimidate any person for the purpose of coercing a sex-selection or race-selection abortion.

3. Solicits or accepts monies to finance a sex-selection or race-selection abortion.

B. The attorney general or the county attorney may bring an action in superior court to enjoin the activity described in subsection A of this section.

C. The father of the unborn child who is married to the mother at the time she receives a sex-selection or race-selection abortion, or, if the mother has not attained eighteen years of age at the time of the abortion, the maternal grandparents of the unborn child, may bring a civil action on behalf of the unborn child to obtain appropriate relief with respect to a violation of subsection A of this section.  The court may award reasonable attorney fees as part of the costs in an action brought pursuant to this subsection.  For the purposes of this subsection, "appropriate relief" includes monetary damages for all injuries, whether psychological, physical or financial, including loss of companionship and support, resulting from the violation of subsection A of this section.

D. A physician, physician's assistant, nurse, counselor or other medical or mental health professional who knowingly does not report known violations of this section to appropriate law enforcement authorities shall be subject to a civil fine of not more than ten thousand dollars.

E. A woman on whom a sex-selection or race-selection abortion is performed is not subject to criminal prosecution or civil liability for any violation of this section or for a conspiracy to violate this section.

F. For the purposes of this section, "abortion" has the same meaning prescribed in § 36-2151.

Doc. 1-1 at 3.

The new § 36-2156 provides:

> A person shall not knowingly perform or induce an abortion before that person completes an affidavit that:
>
> 1. States that the person making the affidavit is not aborting the child because of the child's sex or race and has no knowledge that the child to be aborted is being aborted because of the child's sex or race.
>
> 2. Is signed by the person performing or inducing the abortion.

Doc. 1-1 at 3-4. Section 36-2156 was subsequently renumbered to A.R.S. § 36-2157.

Section 3 of the Act is titled "Purpose," and states:

> Evidence shows that minorities are targeted for abortion and that sex-selection abortion is also occurring in our country. There is no place for such discrimination and inequality in human society. Sex-selection and race-selection abortions are elective procedures that do not in any way implicate a woman's health. The purpose of this legislation is to protect unborn children from prenatal discrimination in the form of being subjected to abortion based on the child's sex or race by prohibiting sex-selection or race-selection abortions.

Doc. 1-1 at 4; *see also* Doc. 1, ¶ 25.

Plaintiffs are the National Association for the Advancement of Colored People, Maricopa County Branch ("Maricopa NAACP"), a local chapter of the national civil rights organization, and the National Asian Pacific American Women's Forum ("NAPAWF"), a national membership organization dedicated to advancing social justice and human rights for Asian and Pacific Islander ("API") women. *Id.*, ¶¶ 1-2, 4-5. They allege that the Act denies equal protection by perpetuating "racially discriminatory stereotypes about Black[, API women, Asian culture,] and abortion care, and thereby demeans, stigmatizes, and discriminates against [their] members." Doc. 1, ¶¶ 3, 6.

## II. Motion to Dismiss.

Defendants argue that the complaint should be dismissed under Rule 12(b)(1) because Plaintiffs lack standing, and under Rule 12(b)(6) because it fails to state a claim. Doc. 25 at 4-11. The Court will address only the Rule 12(b)(1) motion.

### A. Legal Standard.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1985) (citations omitted). "[T]he gist of the question of standing" is whether a plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]" *Baker v. Carr*, 369 U.S. 186, 204 (1962). "[A] plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

An association has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth*, 528 U.S. at 181; *see also Sierra Club v. Morton*, 405 U.S. 727, 739-40 (1972).

Because standing affects a federal court's subject matter jurisdiction, the issue is properly raised in a Rule 12(b)(1) motion to dismiss. *See Chandler v. State Farm Mutual Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (citations omitted). To defeat such a motion, Plaintiffs "need only show that the facts alleged, if proved, would confer

standing upon [them]." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998)). The Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000) (quotation marks and citations omitted). The standing inquiry "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

**B.    Analysis.**

Plaintiff Maricopa NAACP "is one of 2,200 local NAACP chapters around the country" with "hundreds of members, including Black women of child-bearing age." Doc. 1, ¶ 1. Plaintiff NAPAWF "is the largest national, multi-issue API women's membership organization with more than 2,000 dues-paying members and more than 6,000 activists nationwide, including API women in Arizona of child-bearing age." *Id.*, ¶ 4. Plaintiffs' members include women who have sought and will seek abortion care, as well as women who have considered or would consider doing so if faced with an unintended or medically complicated pregnancy. *Id.*, ¶¶ 1, 4.

Plaintiffs' equal protection argument focuses not on the language or effect of the Act – its language is admittedly race-neutral – but on the reasons for the Act's passage. Plaintiffs' complaint quotes at length from the legislative history of the Act and alleges that Arizona legislators acted on the basis of ill-informed racial stereotypes, specifically that Black and API women are more likely to terminate their pregnancies for racial reasons. Plaintiffs argue that "[w]ithout a doubt, the idea that Black women who choose abortion do so out of malicious and racist intent toward their own community is a baseless and invidious racial stereotype. That the Act's sponsors and supporters grossly manipulated statistics, and disregarded all other relevant (and plausible) explanations for the rate of abortion among Black women, to justify the Act is but further evidence of discriminatory intent." Doc. 39 at 7-8.

Plaintiffs do not claim that their members have been denied abortions because of the Act or face prosecution or liability under the Act. To the contrary, they expressly confirm that their "members are not seeking to engage in any conduct prohibited by the Act." *Id.* at 16. Plaintiffs instead base their standing on the fact that the Act stigmatizes and denigrates their members on the basis of race and gender. As Plaintiffs explain, "it is difficult to imagine a greater stigmatic harm than what necessarily flows from being labeled as a member of a group that uses abortion as a deliberate attempt to 'de-select' members of your own race and sex, or of a group so weak-minded that you can be manipulated into having a race-selection abortion without your knowledge." *Id.* at 11 (citations omitted). Because Plaintiffs seek associational standing on behalf of their members, the Court must determine whether their members have standing to sue on the basis of this stigmatic harm.

The Court finds primary guidance in the Supreme Court's decision in *Allen v. Wright*, 468 U.S. 737 (1984). The plaintiffs in *Allen* were parents of black children who attended public schools in districts undergoing desegregation. The plaintiffs brought an equal protection claim asserting that the IRS was improperly granting tax-exempt status to racially discriminatory private schools, an action that benefitted such schools and detracted from the public schools where the plaintiffs' children were educated. The Supreme Court did not question the sincerity of the parents' beliefs or the fact that their sensibilities had been offended by the challenged government policy. The Court held, nonetheless, that the plaintiffs did not have standing to challenge the policies on equal protection grounds: "This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court[.] Respondents here have no standing to complain simply that their Government is violating the law." *Id*. at 754-55.

*Allen* specifically addressed the stigmatic injury asserted by Plaintiffs in this case, and held that it is not sufficient for standing in equal protection cases:

> Neither do [respondents] have standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination. There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing. *See Heckler v. Mathews*, 465 U.S. 728, 739-740, 104 S. Ct. 1387, 1395-96, 79 L. Ed.2d 646 (1984). Our cases make clear, however, that such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct, *ibid.*

*Id.* at 755.

The *Allen* opinion discussed some earlier Supreme Court cases, noting that standing had been asserted in cases where plaintiffs "alleged official racial discrimination comparable to that alleged by respondents here." *Id*. at 755. "Yet standing was denied in each case because the plaintiffs were not personally subject to the challenged discrimination. Insofar as their first claim of injury is concerned, respondents are in exactly the same position: unlike the appellee in *Heckler* . . . they do not allege a stigmatic injury suffered *as a direct result of having personally been denied equal treatment.*" *Id*. (emphasis added).

*Allen* thus makes clear that stigmatizing injury alone is not sufficient for standing in equal protection cases. Plaintiffs must also show that their members personally have been denied equal treatment by the Act. As noted above, Plaintiffs make no such claim. They do not assert that their members have been or will be denied abortions or other medical care, nor that their members have been or will be threatened with enforcement or liability under the Act. Plaintiffs rely entirely on the stigmatizing effect of the Act's legislative history, an effect *Allen* finds insufficient for standing.

The *Allen* opinion refers several times to the Supreme Court's prior decision in *Heckler*, and Plaintiffs cite *Heckler* in support of their arguments. The plaintiff in *Heckler* claimed that he was denied the same Social Security benefits that were afforded similarly situated women, in violation of his equal protection rights. His injury at the hands of the Social Security Administration was concrete: "as a nondependent man, he

receive[d] fewer benefits than he would if he were a similarly situated woman." *Heckler*, 465 U.S. at 738. Thus, as *Allen* explained, *Heckler* is a case where standing was afforded "to those persons who [were] personally denied equal treatment by the challenged discriminatory conduct[.]" *Allen*, 468 U.S. at 754 (quotation marks and citation omitted). Plaintiffs claim no similar personal denial of equal treatment under the Act.

*Heckler* does contain broad language concerning the stigmatizing injuries suffered by a denial of equal protection. 465 U.S. at 739-40. But this language appears in response to the defendant's argument that the plaintiff in *Heckler* lacked standing because one possible outcome of his suit would have been to strike down the discriminatory benefits provision entirely, denying benefits to everyone including the plaintiff. The Court explained that such a possibility did not deprive the plaintiff of standing because he was in fact "personally denied equal treatment" in the benefits awards. *Id.* at 740. The holding of *Heckler* is that a person actually denied benefits under a law has standing to challenge that law on equal protection grounds.

Plaintiffs also cite *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), for the proposition that stigmatic injury suffices for standing in an equal protection case. The plaintiff in *Northeastern* challenged a city ordinance that set aside a certain percentage of the city's contracts for minority-owned businesses. The plaintiff specifically alleged that its members regularly bid on city contracts and would bid on contracts set aside for minority-owned businesses but for the city's ordinance. *Id*. at 659. The Supreme Court held that the plaintiff's members' "inability to compete on an equal footing in the bidding process" constituted "injury in fact" sufficient for standing. *Id*. at 666.

Defendants in *Northeastern* argued that the plaintiff lacked standing because it could not show that any of its members actually lost a contract due to the city's ordinance. *Id.* at 666-67. The Supreme Court held that such a showing was not necessary. The members were actually injured by being denied the right to bid on certain contracts. *Id.* at 667-69. The injury in *Northeastern*, therefore, arose from the direct

effect of the city ordinance on the members' businesses.

Thus, *Allen* holds that the stigmatizing effect of a racially discriminatory law is not sufficient for standing, while *Heckler* and *Northeastern* illustrate the additional showing required – that a plaintiff must actually have been impacted by the law he or she challenges, such as in the denial of equal Social Security benefits or the right to bid on a city contract. *Allen* summarizes the controlling principle: "stigmatizing injury" "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." 468 U.S. at 754 (quotation marks and citation omitted).

To support their claim that stigmatic injury alone is enough, Plaintiffs cite four court of appeals cases: *Catholic League for Religious and Civil Rights v. City and Cnty. of S.F.*, 624 F.3d 1043, 1052 (9th Cir. 2010); *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 785 (9th Cir. 2008); *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012); and *Smith v. City of Cleveland Heights*, 760 F.2d 720, 722 (6th Cir. 1985). Three of these cases are based largely on Establishment Clause jurisprudence that does not apply to this case, and the fourth is not binding on this Court and is simply unpersuasive.

In *Catholic League*, the San Francisco Board of Supervisors adopted a resolution condemning Catholic doctrine on gay relations and marriage and urging a Catholic cardinal to withdraw his directive that Catholic agencies in San Francisco not place children for adoption in gay households. 624 F.3d at 1047. A Catholic civil rights organization and two individual Catholics living in San Francisco sued, claiming that the resolution violated the Establishment Clause. *Id.* at 1047-48. The Ninth Circuit held that the plaintiffs had standing, but based its decision on a long line of Establishment Clause cases that had found standing when individual religious convictions and feelings were injured by government actions.

The Circuit noted, for example, that "[s]tanding was adequate for jurisdiction in Establishment Clause cases in the Supreme Court in the following contexts: prayer at a football game, a crèche in a county courthouse or public park, the Ten Commandments

1 displayed on the grounds of a state capitol or at a courthouse, a cross display at a national
2 park, school prayer, a moment of silence at school, Bible reading at public school, and a
3 religious invocation at a graduation." *Id.* at 1049-50 (footnotes omitted). The Circuit
4 noted that none of these cases involved an actual personal effect on the plaintiffs – the
5 plaintiffs were not forced to pray or read the Bible. Instead, the religious sensibilities of
6 the plaintiffs were injured by the government's endorsement of a particular religion or
7 religious view, and that injury was deemed sufficient to bring an Establishment Clause
8 claim. *Id.* The Circuit cited a similar list of its own Establishment Clause cases. *Id.* at
9 1051.

10 *Catholic League* is thus based squarely on the Establishment Clause. The Ninth
11 Circuit recognized the unique nature of religious injuries: "[a] 'psychological
12 consequence' does not suffice as concrete harm where it is produced merely by
13 'observation of conduct with which one disagrees.' But it does constitute concrete harm
14 where the 'psychological consequence' is produced by government condemnation of
15 one's own religion or endorsement of another's in one's own community." *Id.* at 1052
16 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,*
17 *Inc.*, 454 U.S. 464, 485 (1982)).

18 *Barnes-Wallace* is also an Establishment Clause case. It concerned San Diego's
19 lease of city property to a Boy Scout nonprofit corporation that applied the Boy Scouts'
20 "prohibition against allowing youths or adults who are atheists, agnostics, or
21 homosexuals to be members or volunteers." 530 F.3d at 780-83. Lesbian and agnostic
22 couples filed suit against the city and the Boy Scouts, alleging that leasing public land to
23 an organization that excludes persons because of their religious and sexual orientation
24 violates the Establishment and Equal Protection Clauses. *Id.* at 783. The Ninth Circuit
25 held that the plaintiffs had standing under its Establishment Clause cases (*id.* at 784-86),
26 and therefore never addressed the equal protection issue.

27 In addition to its Establishment Clause analysis, *Barnes-Wallace* included actual
28 injury. The plaintiffs filed declarations stating "that they would like to use Camp Balboa

- 10 -

and the Aquatic Center, but that they avoid doing so because they are offended by the Boy Scouts' exclusion, and publicly expressed disapproval, of lesbians, atheists and agnostics." *Id.* at 784. The Ninth Circuit held that "[o]ur Establishment Clause cases have recognized an injury-in-fact when a religious display causes an individual such distress that she can no longer enjoy the land on which the display is situated." *Id.* The Circuit made clear that the plaintiffs had "alleged injuries beyond 'the psychological consequence presumably produced by observation of conduct with which they disagree,' because their inhibition interferes with their personal use of the land." *Id.* (quoting *Valley Forge*, 454 U.S. at 485; brackets omitted). In short, standing existed in *Barnes-Wallace* because "the plaintiffs ha[d] shown *both* personal emotional harm *and* the loss of recreational enjoyment[.]" *Id.* at 785 (emphasis added).

*Awad v. Ziriax* is another Establishment Clause case. The plaintiff, a Muslim resident of Oklahoma, sought to enjoin state election officials from certifying the passage of a state constitutional amendment that prohibited state courts from using Sharia law. 670 F.3d at 1116-19. The Tenth Circuit recognized the unique nature of standing analysis under the Establishment Clause, noting that it can be "'particularly elusive.'" *Id.* at 1120 (quoting *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 504-05 (5th Cir. 2007)). After reviewing a series of Establishment Clause cases, the Tenth Circuit concluded that "*in the context of alleged violations of the Establishment Clause*, standing is clearly conferred by non-economic religious values." *Id.* at 1122 (emphasis added; quotation marks, ellipsis, and citation omitted). The Court nonetheless made clear that "it is not enough for litigants to claim a constitutional violation. They must also identify a personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.* (quotation marks, brackets, and citation omitted). The plaintiff in *Awad* had alleged such a personal injury because the constitutional amendment "prohibit[ed] him from relying on his religion's legal precepts in Oklahoma courts, while not prohibiting people of all other faiths to rely on the legal precepts of their

- 11 -

religions." *Id.* at 1123. Among other things, the plaintiff asserted that his last will and testament called for the application of Sharia law, something not allowed under the amendment. *Id.* at 1119. Thus, *Awad* is an Establishment Clause case that included a concrete personal injury.

*Smith v. City of Cleveland Heights* is not an Establishment Clause case. The Sixth Circuit held that a black resident of Cleveland Heights had standing to challenge the city's policy of steering white homebuyers toward the city and black homebuyers away from the city in order to maintain its 75% white racial majority. 760 F.2d at 721. The Circuit held that the plaintiff had standing simply because "the steering policies stigmatize him as an inferior member of the community in which he lives." *Id.* at 722. The Court finds this holding to be clearly inconsistent with *Allen*.

In sum, this is not an Establishment Clause case and *Smith* is unpersuasive. Stigmatic injury does not suffice under *Allen*, and Plaintiffs "fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge*, 454 U.S. at 485 (emphasis in original). The Court lacks subject matter jurisdiction.

**IT IS ORDERED:**

1. Defendants' motion to dismiss (Doc. 25) is **granted**.
2. The motions to intervene (Doc. 18) and to supplement the motion to intervene (Doc. 36) are **denied** as moot.
3. The Clerk shall terminate this action.

Dated this 3rd day of October, 2013.

David G. Campbell
United States District Judge